## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| MELISSA B. CHAPMAN, DDS, | Case No. 20-CV-1155 (NEB/BRT) |
| Plaintiff, | |
| v. | ORDER ON CROSS MOTIONS FOR |
| | SUMMARY JUDGMENT |
| UNUM LIFE INSURANCE COMPANY OF AMERICA,[1] | |
| Defendant. | |

---

Dr. Melissa B. Chapman suffers from degenerative arthritis[2] in her hands that rendered her disabled—she can no longer perform her job as an endodontist. She sought disability benefits from Provident, her insurer. Provident granted benefits under the insurance policy's "sickness" coverage, running until she turned 65. Dr. Chapman contended that she had been "injured" and is entitled to lifetime benefits. Provident disagreed and, after an administrative appeal process, denied her claim for "injury," but continued to pay benefits for "sickness." Dr. Chapman filed this lawsuit under the

---

[1] Unum asserts that Dr. Chapman misidentified it and that the proper defendant is Provident Life and Accident Insurance company of America. (ECF No. 19 at 1.) Dr. Chapman has no objection. (ECF No. 34 at 1 n.1.) The Court accordingly refers to the defendant here as "Provident."

[2] Dr. Chapman's official diagnosis is "osteoarthritis," but the Court refers to her condition as "arthritis" for the sake of convenience.

Employee Retirement Income Security Act of 1974 ("ERISA"), seeking to overturn Provident's decision. The parties moved for judgment under a *de novo* review standard. For the reasons below, the Court grants Dr. Chapman's motion, denies Provident's, and awards Dr. Chapman attorney's fees, subject to determination of the final amount.

## LEGAL STANDARD

Before the Court can consider the merits, a few observations on the legal standard the Court applies are in order. The parties agreed that the Court reviews Provident's ERISA benefits decision *de novo*, giving no deference to that decision. (ECF No. 19 at 12; ECF No. 26 at 18.) This standard follows the practice in this district, where review of ERISA benefits decisions are made by the district court acting "as the fact finder, mak[ing] credibility determinations, and weigh[ing] the evidence as applied to the governing insurance policy." *Avenoso v. Reliance Std. Life Ins. Co.*, No. 19-CV-2488 (WMW/DTS), 2021 WL 1140205 (D. Minn. Mar. 25, 2021) (citations omitted); *Kaminski v. UNUM Life Ins. Co. of Am.*, --- F. Supp. 3d ----, No. 19-CV-1997 (SRN/DTS), 2021 WL 411438, at *26 (D. Minn. Feb. 5, 2021) (considering "whether the plaintiff's claim for benefits is supported by a preponderance of the evidence based on the district court's independent review.") (internal quotation omitted).

But the parties moved for  summary judgment under Rule 56, which dictates a standard different from a *de novo* review of evidence: "Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that

there is no genuine [dispute] as to any material fact and that the movant is entitled to judgment as a matter of law." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 792 (8th Cir. 2012) (citing Fed. R. Civ. P. 56(c)(2)).

At argument, the Court raised whether making credibility determinations and weighing the evidence at this stage violated Rule 56.[3] The parties agreed that the standard they provided the Court was appropriate for resolution of their cross-motions. The Court requested a stipulation to that effect, which the parties filed.  (ECF No. 37) (stipulating that "[t]he Court is to determine, de novo, whether Plaintiff has met her burden by a preponderance of the evidence, based on the administrative record, without consideration of Fed. R. Civ. P. 56 motion standards").

---

[3] There is currently circuit disagreement on the application of Rule 56 in the ERISA context. *Compare Orndorf v. Paul Revere Life Ins. Co.*, 404 F.3d 510, 517 (1st Cir. 2005) ("[I]n an ERISA case where review is based only on the administrative record before the plan administrator and is an ultimate conclusion as to disability to be drawn from the facts, summary judgment is simply a vehicle for deciding the issue. This means the non-moving party is not entitled to the usual inferences in its favor.") (citation omitted), *and LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (same), *with O'Hara v. Nat'l Union Fire Ins. Co.*, 642 F.3d 110, 116 (2d Cir. 2011) ("[T]he district court's task on a summary judgment motion—even in a nonjury case—is to determine whether genuine issues of material fact exist for trial, not to make findings of fact.") *and Kearney v. Std. Ins. Co.*, 175 F.3d 1084, 1094 (9th Cir. 1999) (concluding that a genuine issue of material fact existed and remanding for further factfinding); *see Johnson v. Wellmark of S.D., Inc.*, 441 F. Supp. 3d 780, 797–99 (D.S.D. 2020) (describing the circuit split).

The Eighth Circuit has noted that courts have struggled with the use of summary judgment in ERISA cases, but has not weighed in.  *Khoury v. Grp. Health Plan, Inc.*, 615 F.3d 946, 951 n.4 (8th Cir. 2010).

The Court therefore uses the *de novo* standard, under which Dr. Chapman bears the burden to prove that her disability is due to accidental bodily injury by a preponderance of the evidence, based on the administrative record. Applying this standard, the Court finds the following facts and conclusions of law.

## FINDINGS OF FACT

The parties agree that Dr. Chapman is disabled, but they disagree sharply over the cause of her disability and whether the Policy requires Provident to pay benefits for it.

### I. The Policy

Dr. Chapman stopped working on October 31, 2018, at the age of 60. (ECF Nos. 31, 31-1 (together, "R.") at 32, 667–68.)[4] The Policy provides that if Dr. Chapman suffered a disability because of a "sickness" between her 60th and 61st birthdays, Provident would pay benefits through her 65th birthday. (*Id.* at 139.) If, however, an "injury" caused her disability and it began before the age of 65, Provident would pay benefits for life. (*Id.* at 138.)

Under the Policy, "Injuries" are "accidental bodily injuries occurring while [the P]olicy is in force." (*Id.* at 142.) "Sickness" is a "sickness or disease which is first manifested while [the P]olicy is in force." (*Id.*) And the "fact that a disability is caused by

---

[4] Here, the Court cites the sealed administrative record that Provident relied upon in making its decision on Dr. Chapman's application for benefits. (ECF Nos. 31, 31-1.) The pagination comes from the Bates-stamp numbers on each page, with the leading zeroes deleted.

more than one Injury or Sickness or from both will not matter. [Provident] will pay benefits for the disability which provides the greater benefit." (*Id.* at 144.)

## II.    The Disability and Administrative Process

The parties agree that Chapman is suffering from degenerative arthritis in her hands and fingers that makes it impossible for her to carry out her work as an endodontist. (*Compare* ECF No. 19 at 1 ("Plaintiff's disabling condition, degenerative joint disease/osteoarthritis . . . ."), *with* ECF No. 26 at 1 (noting that Dr. Chapman "developed debilitating osteoarthritis in her hands, causing total disability . . . .").)

### A.    Dr. Chapman's Work and Pre-Claim Developments

An endodontist is a specialized form of dentist that specifically focuses on treating tooth pain, mainly related to root canals and internal tooth problems. (R. at 664.) Generally, each time Dr. Chapman does a root canal or treats tooth pain, she must make multiple injections, use handheld files inside tooth canals, and then use powered tools to complete her work; at times, she may spend an hour hand filing a tooth during a procedure. (*Id.* at 40.) This work is highly repetitive and requires "a tremendous amount of pressure and force" to hold and operate the files and tools effectively. (*Id.*) The process requires substantial fine motor control and delicate hand movements to accomplish. (*Id.*) Before her disability, Dr. Chapman performed this work for over 29 years. (*Id.*)

Dr. Chapman stands 4 feet, 10 inches tall. (R. at 189.) She practices left-handed, but her tools are generally designed for right-handed endodontists, which may require her

to alter her technique or operate the tools in a way that increases stress on her joints vis-à-vis endodontists who practice right-handed. (*Id.* at 664.) Dr. Chapman began suffering pain in her hands at the age of 40; this slowly worsened throughout her fifties. (*Id.* at 673.) At the beginning, she would start the day with little pain, but it would progress; often, after work, she would go home and ice her hands or treat them with heat so that she could work again in the morning. (*Id.* at 667.) At this point in her career, heat and ice, combined with ibuprofen and night splints, were enough to permit her to continue her work. (*Id.* at 326–27.) In 2012, Dr. Chapman visited a rheumatologist, Dr. Berglund, to test for potential genetic indicators for arthritis; Dr. Berglund found no such evidence. (*Id.* at 326, 667.) Dr. Berglund also stated that Dr. Chapman's condition resulted from a "dental injury." (*Id.* at 327.)

Four years later, in 2016, Dr. Chapman sought treatment from Dr. Thomas Varecka, an orthopedist. (*Id.* at 493–94.) Dr. Varecka first diagnosed Dr. Chapman with "diffuse chronic progressive degenerative joint disease involving multiple digits in both hands." (*Id.* at 494) On her second visit to Dr. Varecka, Dr. Chapman's condition had worsened. (*Id.* at 496.) On at least two visits to Dr. Varecka in 2018, Dr. Chapman received steroid injections to help alleviate her pain. (*Id.* at 347–48, 350–51.)

## B.    *Initial Claim and Payment of Benefits*

About a month after her second steroid injection, Dr. Chapman filed a claim with Provident, asserting that she was disabled due to her arthritis, and claiming an injury

under the Policy. (R. at 32–35.) Dr. Chapman described the injury as a "*Gillette* injury"[5] to her hands because of her work as an endodontist. (*Id.*)

In support of Dr. Chapman's claim, Dr. Varecka submitted an Attending Physician Statement, in which he stated that Dr. Chapman suffered from "Advanced Degenerative Joint Disease of Both Hands Aggravated & Accelerated by Work as Endodontist." (*Id.* at 88.) Dr. Varecka noted that changes on Dr. Chapman's X-ray, as well as a clinical exam, supported this diagnosis. (*Id.*) On the form, Dr. Varecka checked a box that said Dr. Chapman was not suffering from "sickness." (*Id.*) The form also contains boxes to check for "accident" (yes or no); Dr. Varecka left them blank. (*Id.*) In Dr. Varecka's view, Dr. Chapman's disability was permanent. (*Id.* at 89.) Provident told Dr. Chapman it would be administering her claim under the Policy's "sickness" provision. (*Id.* at 323–24.)

## C.   *Provident's Physician Reviews and Claim Decision*

After its initial review of the claim, Provident sought the opinion of John R. Groves, M.D., who is board certified in orthopedic surgery. (R. at 506–07.) Dr. Groves reviewed Dr. Chapman's medical records and agreed with Dr. Varecka's conclusion that Dr. Chapman was disabled, but he disputed the cause of the disability. (*Id.*) Dr. Groves concluded that the cause of Dr. Chapman's arthritis was "most likely . . . genetic" as Dr.

---

[5] "*Gillette* injury" is a reference to the Minnesota Supreme Court case *Gillette v. Harold, Inc.*, 101 N.W.2d 200 (1960), which held that disabilities resulting from daily ordinary activities that "cause minimal damage" but have "the cumulative effect" of being "completely disabling" are compensable "injuries" under Minnesota worker's compensation law. *Id.* at 206.

Chapman did not claim or report a "specific traumatic event" and because, in his experience, "osteoarthritis [wa]s not casually related to using a joint in the manner for which it was designed. Use of the hands on a daily basis as a dentist . . . would not in [his] opinion be causative of arthritis." (*Id.* at 507.) Dr. Groves did not develop the rationale behind his conclusion that "the arthritis that developed was due to a genetic predisposition to that condition." (*Id.*) Despite disputing the initial cause, Dr. Groves agreed that, once arthritis had developed, Dr. Chapman's work "would reasonably accelerate and aggravate" it. (*Id.*) Dr. Groves also believed that Dr. Chapman had insisted that Dr. Varecka's statement include language about a *Gillette* injury in bold, rather than not in bold. (*Id.*; *see id.* at 343.)

In March 2019, Provident told Dr. Chapman that it had approved her claim and was paying benefits under the "sickness" provision, but that it was continuing to review the cause of her disability and that it would make a final decision after it completed its review. (*Id.* at 520–21.) To resolve the dispute between Dr. Varecka and Dr. Groves, Provident consulted Philip Lahey, M.D., also board certified in orthopedic surgery. (*Id.* at 539.) Dr. Lahey reviewed Dr. Chapman's records and concurred that Dr. Chapman was disabled and that her work could exacerbate her arthritis, but likewise disputed Dr. Varecka's conclusion about causation. (*Id.*) Dr. Lahey noted that the medical profession had not "definitively identified" a genetic source for arthritis, but believed that there was a reasonable inference that arthritis could have a genetic component. (*Id.*) Dr. Lahey did

not opine on whether Dr. Chapman's disability was genetic but concluded that "there is no history of an injury having been sustained . . . that would be expected to lead to her condition." (*Id.*) Dr. Lahey also disputed that Dr. Chapman's work caused her disability because "if it were caused by practicing endodontics, all or a majority of endodontists" would suffer from arthritis. (*Id.*) In the end, for Dr. Lahey, the lack of a single traumatic event resolved the issue that Dr. Chapman's disability was a "sickness": "[W]hether this is based on genetics or another unknown factor . . . , there is no indication of a specific occurrence or injury in the past that has caused the condition." (*Id.*)

### D.    The Appeal Process

Based on the opinions of Dr. Groves and Dr. Lahey, Provident then told Dr. Chapman that it had concluded that her disability stemmed from "sickness," not "injury," and that it would pay her benefits only until she turned 65. (R. at 570–72.) Dr. Chapman appealed. (*Id.* at 601 ("Please find this letter as Dr. Chapman's official written notice of her appeal . . . ."); *id.* at 601–08.) In her appeal, Dr. Chapman included a statement from Dr. Varecka elaborating on three things: (1) his familiarity with Dr. Chapman's job duties as an endodontist; (2) his opinion about the cause of Dr. Chapman's disability; and (3) his own assessment of Dr. Groves and Dr. Lahey's conclusions. (*Id.* at 607–08.)

In processing Dr. Chapman's appeal, Provident provided her records to Peter E. Bentivegna, M.D., a hand specialist. (*Id.* at 630.) Dr. Bentivegna agreed that Dr. Chapman was disabled, but, like Dr. Groves and Dr. Lahey, did not agree with Dr. Varecka as to

causation. (*Id.*) Dr. Bentivegna concluded that Dr. Chapman's medical records were insufficiently developed to support a diagnosis of "multiple minor trauma" because they did not include documentation of her condition over time. (*Id.*) Because there was no such documentation, Dr. Bentivegna concluded that a sickness or illness caused Dr. Chapman's disability—not an "injury." (*Id.*)

In response to Dr. Bentivegna's opinion, Gerald K. Morley, M.D., a board-certified neurologist examined Dr. Chapman. (*Id.* at 662.) Dr. Morley stated that Dr. Chapman's "x-rays . . . demonstrated significant traumatic arthritis in her fingers and . . . hands indicating . . . arthritis due to significant injury to the hands themselves."[6] (*Id.* at 668.) Dr. Morley concluded that Dr. Chapman had "traumatic arthritis due to a *Gillette* injury over many years of prolonged use of her hands that has continued to the present." (*Id.* at 671.) Dr. Chapman also submitted a document from the National Institutes of Health ("NIH") that warned that dentists suffer from an increased risk of arthritis in their hands compared to the general population, and also that dentists who had less task variation were more at risk than those with high variation.[7] (*Id.* at 663–64.) Finally, Dr. Chapman

---

[6] Dr. Bentivegna noted that it "is unclear if [Dr. Morley] viewed the x[-]rays." (R. at 731.)

[7] Berran Yucesoy et al., *Occupational and Genetic Risk Factors for Osteoarthritis: A Review*, 50 Work 261 (2015), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4562436/pdf/nihms-718785.pdf (hereinafter "Yucesoy" or the "Yucesoy Article"). Dr. Chapman also cited a statement from the American Association of Endodontists describing the differences between dentists and endodontists. (*Id.* at 664); *see American Ass'n of Endodontists*, *What's the Difference Between a Dentist and an Endodontist*, https://www.aae.org/patients/why-see-an-endodontist/whats-difference-dentist-endodontist/ (last visited June 30, 2021).

included an affidavit detailing her family history of arthritis; in her affidavit, she presented a family medical history of arthritis that appears inconsistent with her own arthritis. (*Id.* at 672–73.)

Provident again sought Dr. Bentivegna's opinion in reply. (*Id.* at 731–32.) Dr. Bentivegna dismissed Dr. Morley's examination and diagnosis as being "qualitative" and as addressing something that was "not part of the disability issue at hand." (*Id.* at 732.) Dr. Bentivegna did not credit Dr. Chapman's affidavit as "the lack of a genetic component does not confirm the diagnosis of post traumatic arthritis [and t]his case speaks to degenerative arthritis." (*Id.*) Finally, Dr. Bentivegna concluded that the NIH article was "a general arthritis article concerning heavy manual laborers," not dentists who "are light laborers," and the article was "specified to knee arthritis" while Dr. Chapman "has hand arthritis."[8] (*Id.*)

Based on the added information and Dr. Bentivegna's reviews, Provident denied the appeal. (*Id.* at 753–58.) This lawsuit followed.

## CONCLUSIONS OF LAW

Resolution of this case turns chiefly on the Court's interpretation of the term "accidental bodily injuries."

---

[8] The Yucesoy article, however, does address studies of arthritis in dentists, not solely construction workers, as well as hand arthritis, not just knee arthritis. (*Id.* at 678–79.)

I.       **"Injury" vs. "Sickness"**

The core question here is whether the record supports Provident's conclusion that a "sickness" caused Dr. Chapman's disability rather than an "injury." The Court concludes that it does not.

A.       *Accidental Bodily Injury*

Under the Policy, an "injury" is an "accidental bodily injur[y]." (R. at 142.) Provident argues that the Court should read this definition as a single term, while Dr. Chapman argues that the Court should view "accident" and "injury" separately. The Court agrees with Dr. Chapman. In so concluding, federal common law governs the Court's analysis. *Reid v. Conn. Gen. Life Ins. Co.*, 17 F.3d 1092, 1098 (8th Cir. 1994) ("[W]here there is no federal statutory law to apply in ERISA litigation, 'federal common law,' not state law, should be applied.") (citing *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 56 (1987)).

First, treating "accident" and "injury" as a single term, Provident's approach, runs contrary to ERISA principles. ERISA mandates that the plans it governs "be written in a manner calculated to be understood by the average plan participant, and . . . be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan."[9] 29 U.S.C. § 1022(a); *Spizman*

---

[9] Although Section 1022(a) provides requirements for plan summaries, "as a general rule, when the plan summary conflicts with the plan it purports to summarize, the summary provision governs." *Jessup v. Alcoa, Inc.*, 481 F.3d 1004, 1007 (8th Cir. 2007) (cleaned up).

*v. BCBSM, Inc.*, 855 F.3d 924, 927 (8th Cir. 2017). This understanding—that the Court construe the Policy in accordance with its terms' "ordinary, plain meaning"—is woven through ERISA jurisprudence. *E.g.*, *Spizman*, 855 F.3d at 927 ("Because an ERISA plan must be 'written in a manner calculated to be understood by the average plan participant,' 29 U.S.C. § 1022(a), we accord policy terms their ordinary, plain meaning.").

Second, the Eighth Circuit has adopted the test set forth in *Wickman v. Northwestern National Insurance Co.*, 908 F.2d 1077 (1st Cir. 1990), as the standard by which the Court determines whether a disability arises by "accident" in the ERISA context. *Nichols v. Unicare Life & Health Ins. Co.*, 739 F.3d 1176, 1179, 1183–84 (8th Cir. 2014) (applying *Wickman* to an ERISA case in which the plan beneficiary died after an undetermined drug intoxication). That the Eighth Circuit adopted a specific test for "accident" but not for "injury" supports Dr. Chapman's contention that "accident" and "injury" are separate concepts.

Third, ERISA is remedial legislation and courts should "liberally construe[ it] to effectuate Congress's intent to protect plan participants." *Brown v. J.B. Hont Transp. Servs., Inc.*, 586 F.3d 1079, 1086 (8th Cir. 2009). Construing "accident" and "injury" as separate concepts adheres to this principle.

Finally, logic and common sense support the treatment of "accident" and "injury" as separate concepts. Not all injuries are necessarily accidental; a plan beneficiary may render herself disabled through her own deliberate actions. And some accidents do not

13

cause injuries. For example, a minor fender-bender collision is almost invariably termed an "accident," even if no one suffers an "injury."[10]

1.      *"Accidental"*

Under *Wickman*, the Court applies a two-pronged inquiry to determine whether the disability resulted from an accident. First, the Court looks to whether the disabled party subjectively expected to suffer "an injury 'similar in type or kind to that suffered.'" *McClelland v. Life Ins. Co. of N. Am.*, 679 F.3d 755, 758 n.2 (8th Cir. 2012) (quoting *Wickman*,

---

[10] Provident's arguments to the contrary are not persuasive. Provident contends that *King v. Pennsylvania Life Insurance Co.*, 470 F. App'x 439 (6th Cir. 2012), supports its position that the concepts of accident and injury are intertwined. *King* was a diversity case that applied Michigan state law, not the federal common law of ERISA. *Id.* at 443; *see Spizman*, 855 F.3d at 927 ("In construing ambiguities in an ERISA plan, we apply federal law, not Minnesota law, construing disputed language without deferring to *either* party's interpretation.") (quotation omitted; emphasis original). The *King* court held (citing the very authorities Provident cites) that an "accidental bodily injury" "refers to physical damage to the body caused by an external, violent, unanticipated cause that is neither clearly medical nor biological." 470 F. App'x at 444. But Michigan law considers an "accidental bodily injury" to be a single concept and construes it narrowly. *Nehra v. Provident Life & Accident Ins. Co.*, 559 N.W.2d 48, 51 (Mich. 1997) ("[W]ithout [a] temporal/spatial component [of a single accident], the word 'accidental' adds almost nothing to the phrase 'accidental bodily injuries.'"). As discussed above, this strays from federal common law.

Likewise, *Bilezikjian v. Unum Life Insurance Co. of America* is a California state-law case. 692 F. Supp. 2d 1203, 1204 (C.D. Cal. 2010). And California, like Michigan, requires a single, identifiable injury manifesting at "an identifiable time." *Id.* at 1222 (citing *Gin v. Pa. Life Ins. Co.*, 36 Cal. Rptr. 571, 575 (Cal. Ct. App. 2005)). Because the plaintiff (disabled through carpal tunnel syndrome; similar, in many respects, to Dr. Chapman) could not show such an injury, the court granted the plan summary judgment. *Id.* at 1223. This approach contradicts ERISA itself and Eighth Circuit jurisprudence, as well as logic and common sense.

908 F.2d at 1088). Second, the Court looks to whether those expectations were reasonable, "allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences." *Id.* (quotation omitted). If the record does not show the subjective expectation, the Court then must consider "whether a reasonable person, with background and characteristics similar to the insured, would have viewed the injury as highly likely to occur as a result of the insured's intentional conduct." *Id.* (quotation omitted).

Applying *Wickman* to Dr. Chapman's case is straightforward: based on the record before the Court, arthritis arising from her work as an endodontist is accidental.[11] The record does not reflect Dr. Chapman's subjective expectations about the possibility of suffering arthritis as a result of practicing endodontia and the Court therefore looks to whether a reasonable person in her position, with her knowledge and experience, would have viewed the possibility of disabling arthritis as "highly likely." *McClelland*, 679 F.3d at 758 n.2.

There is no evidence of record that a reasonable endodontist with Dr. Chapman's knowledge and experience would believe that degenerative, disabling arthritis would be "highly likely" to result from a career in endodontia. The record contains one article published in 2015 as the earliest record evidence showing a possible connection between

---

[11] Here, the Court assumes that work as an endodontist can cause arthritis through multiple minor traumatic incidents. The Court finds that this did happen to Dr. Chapman below. *See infra* Conclusions of Law Section I.B.

Dr. Chapman's work and her arthritis. (R. at 678–79.) Dr. Chapman did not consult a doctor about her arthritis until she was 51, in 2012—three years before publication. Even at that point, a reasonable person in Dr. Chapman's position would not have considered it "highly likely" that she was suffering from disabling arthritis or that disability was a "highly likely" result of continuing to practice. It strains credulity to conclude that any endodontist views the possibility of disabling arthritis simply by practicing endodontia as "highly likely"—were that the case, the dental field would be suffering a severe shortage of endodontists. The record contains no reason for Dr. Chapman to believe that her continued practice of endodontia would ultimately disable her.

On the point of Dr. Chapman's expectations, Provident's arguments to the contrary are also unavailing. In particular, Provident has taken a position inconsistent with its administrative position denying Dr. Chapman benefits. In the administrative proceeding, Provident denied Dr. Chapman benefits because her "disability is due to a sickness, and not an injury. Repetitive stress, as in the overuse of [her] hands does not constitute and injury under [the Policy. Her] medical condition is degenerative in nature and no trauma or injury occurred" to cause it. (R. at 572.) Now, in its briefing, Provident argues that, by citing scientific literature connecting endodontia with arthritis, Dr. Chapman "has effectively conceded that her osteoarthritis/degenerative joint disease was subjectively and objectively foreseeable and not a 'chance result'" and therefore not accidental. (ECF No. 32 at 4.) As discussed above, the Court concludes that a person in

16

Dr. Chapman's position could reasonably believe that it was not "highly likely" that she would develop disabling arthritis as a result of her practice. And even were the Court to accept that this is the case (it does not), an insurer cannot use "a *post hoc* rationale . . . to justify a decision reached on different grounds during the administrative process."[12] *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 1003 (8th Cir. 2005) (en banc).

Under *Wickman*, the development of disabling arthritis from the practice of endodontia is accidental.

2.      *"Injury"*

The next question is whether the arthritis is an "injury." Compared to the term "accident," the definition of "injury" is much less well-developed in the ERISA context.[13] When no federal common law applies, the Court "may look to state law for guidance, provided state law does not conflict with ERISA or its underlying policies." *McDaniel v. Med. Life Ins. Co.*, 195 F.3d 999, 1002 (8th Cir. 1999).

While this case has no connection to Georgia, a case decided in Georgia is persuasive here for its almost identical facts. In *Provident Life & Accident Ins. Co. v. Hallum*,

---

[12] The rest of Provident's argument rests on its assertion that the Court should read "accidental bodily injury" as a single term, which the Court has rejected. (*E.g.*, ECF No. 19 at 12–17.)

[13] In fact, the parties did not direct the Court to *any* cases addressing whether repetitive trauma can lead to an "injury" in the ERISA context, nor is the Court aware of any.

576 S.E.2d 849 (Ga. 2003) a medical professional sued,[14] alleging he was disabled because of carpal tunnel syndrome "brought on by years of voluntary repetitive hand movements."[15] *Id.* at 850. As here, Provident  accepted that he was disabled and that benefits were due, but argued the cause was "sickness," not "injury." *Id.* The policy language was identical to the policy language here.

The Georgia Supreme Court held that "an unexpected physical injury that disables the insured is covered as an 'injury'" because the "focus" of the coverage of the plan is on "the coverage o[f] the injuries." *Hallum*, 576 S.E.2d at 851. The Georgia Supreme Court also found it important that "the terms of the policy specifically contemplate that a disability could be the result of more than one injury or sickness or a combination of the two," as here. *Id.*; (*see* R. at 144 (same policy language)). In particular "[a] person could suffer a series of small traumas over an extended period that ultimately resulted in a bodily injury that was disabling." *Hallum*, 576 S.E.2d at 851. Essentially, this straw-that-

---

[14] *Hallum* began its life in federal court and ended up before the Supreme Court of Georgia through certification from the Eleventh Circuit. 576 S.E.2d at 850 (answering "the question of whether, under Georgia law, carpal tunnel syndrome caused by repetitive hand motion should be classified as an injury or a sickness, as those terms are used in the policy").

[15] The record in that case showed that Hallum did "not have, and has not had, any of the diseases generally associated with carpal tunnel syndrome. Rather, the record shows that his condition was caused by thirty years of performing the hand motions required by his . . . practice. . . ." 576 S.E.2d at 850. As detailed below, the Court reaches the same conclusion here.

broke-the-camel's-back approach is identical to that of the Minnesota Supreme Court in *Gillette.* 101 N.W.2d at 206 ("In the course of one's ordinary duties injuries may occur daily which cause minimal damage, the cumulative effect of which in the course of time may be as injurious as a single traumatic occurrence which is completely disabling."). This distinction is persuasive: the Court sees "no good reason why [benefits] should be paid in one instance and not in the other." *Id.*

And again, the Court's conclusion reflects ERISA's remedial purpose. *Brown*, 586 F.3d at 1086. The Court considers Provident's reading of the term "injury" to be unduly restrictive and contrary to ERISA's remedial nature, as well as the Eighth Circuit's direction that the court "liberally construe[ it] to effectuate Congress's intent to protect plan participants."[16] *Id.*

Finally, as a matter of logic and common sense, disabilities caused by repetitive trauma are often termed "repetitive stress *injuries*" not "repetitive stress *sicknesses*." An ordinary plan participant would likely expect that an insurer would cover repetitive

---

[16] Were the Court to conclude that the Policy's language is ambiguous, it could construe the Policy against Provident, as the Policy's drafter. *Delk v. Durham Life Ins. Co.*, 959 F.2d 104, 105–06 (8th Cir. 1992) ("As a matter of federal common law, a court construing plans governed by ERISA should construe ambiguities against the drafter only if, after applying ordinary principles of construction, giving language its ordinary meaning and admitting extrinsic evidence, ambiguities remain."). This is not inconsistent with *Spizman*. Although *Spizman* states that courts should not apply "the contra insurer . . . doctrine[]," in construing an ERISA plan, *Spizman* says nothing about whether the Court may do so if it concludes that the language is ambiguous, the very circumstance *Delk* addresses. 855 F.3d at 927. In any event, the Court does not apply the presumption because the Policy is not ambiguous.

stress injury under Provident's definition of "accidental bodily injury." *See* 29 U.S.C. § 1022(a).

For these reasons, the Court concludes that arthritis caused by repetitive minor trauma through practice of endodontia is an "accidental bodily injury" as the Policy defines that term.

**B.      Causation**

Having concluded that the Policy covers arthritis caused by repetitive trauma from work as an endodontist, the Court must consider the issue of causation. It is relatively easy to dispatch with this question; the record establishes that Dr. Chapman's arthritis stems from her practice as an endodontist.

Four of the five doctors who either examined Dr. Chapman or who looked at her medical records agreed that Dr. Chapman's work either caused or exacerbated her condition. (R. at 88–89 (Dr. Varecka); *id.* at 506–07 (Dr. Groves); *id.* at 539 (Dr. Lahey); *id.* at 668 (Dr. Morley).) Dr. Varecka and Dr. Morley agreed that Dr. Chapman's work caused her arthritis; Dr. Groves and Dr. Lahey, while agreeing that her work did not *cause* the disability, disagreed on what the cause was. (*Compare id.* at 88–89, 668, *with id.* at 506–07, 539.)

The record evidence establishes, by a preponderance of the evidence, that Dr. Varecka and Dr. Morley were correct for several reasons. First, they are the only two

20

physicians to completely agree with each other in the cause of Dr. Chapman's disability (and two of Provident's reviewers also agreed). (*Id.* at 88–89, 506–07, 539, 668.)

Second, Dr. Groves concluded that Dr. Chapman's disability was likely genetic, but Dr. Berglund, who examined Dr. Chapman, found no evidence of genetic indicators for arthritis, and that Dr. Chapman's arthritis differs from her family history of the same condition.[17] (*Id.* at 506–07; *id.* at 326–27, 667; *id.* at 672–73.) The Court does not credit Dr. Groves's opinion because he offered no foundation for his conclusion that Dr. Chapman's condition was "most likely on a genetic basis," (*id.* at 507), especially in light of evidence that Dr. Chapman had no family history of or genetic markers for arthritis.

Third, Dr. Lahey concluded that because no single traumatic event caused Dr. Chapman's disability, a sickness must have caused it. (*Id.* at 539.) In doing so, Dr. Lahey ignored the possibility of multiple minor traumatic incidents. Dr. Lahey also failed to support his opinion that "if [arthritis] were caused by practicing endodontics, all or a majority of endodontists would experience" Dr. Chapman's condition. (*Id.*) And his opinion is not realistic. The same tasks undertaken by different people may have different results, and the fact that the majority of practicing endodontists have not developed disabling arthritis does not categorically exclude the possibility that Dr. Chapman's work

---

[17] Dr. Bentivegna opined that a lack of a "genetic component does not confirm the diagnosis of post traumatic arthritis." (R. at 732.) Although possibly correct, Dr. Bentivegna did not offer another explanation for Dr. Chapman's arthritis.

caused her disability. The Court therefore finds Dr. Lahey's conclusions unsupported by the record and not credible.

Fourth, none of Provident's doctors examined Dr. Chapman—their conclusions rest only on review of medical records. Provident asserts that it need not have its experts examine an insured in every case. The Court agrees that there are cases in which no such examination is necessary. But Dr. Varecka and Dr. Morley examined Dr. Chapman personally, heard her description of her condition directly, and could question her about her condition and medical history. Combined with all of the other evidence supporting their opinions, the Court affords their conclusions more weight.[18]

## II.     Attorneys' Fees

Dr. Chapman also seeks attorneys' fees. Under ERISA, the Court has discretion to award attorney's fees. 29 U.S.C. § 1132(g)(1); *Martin v. Ark. Blue Cross & Blue Shield*, 299 F.3d 966, 969 (8th Cir. 2002) (en banc). In considering whether to award fees in an ERISA case, the Court looks at five factors: (1) the degree of bad faith from the insurer; (2) the insurer's ability to pay; (3) deterrent effect of a fee award; (4) the significance of the legal

---

[18] Even if the record supported a different cause for Dr. Chapman's disability, the Policy's language dictates that Provident cover her disability as an "injury." The Policy states that "[t]he fact that a disability is caused by more than one Injury or Sickness or from both will not matter. [Provident] will pay benefits for the disability which provides the greater benefit." (R. at 144.) Even if the record supported an initial cause independent of her work, Dr. Chapman's *disability* would still be "caused by more than one Injury or Sickness or from both" and Provident must therefore cover it according to whichever provision provides more coverage—here, "injury."

question posed; and (5) the relative merits of the parties' positions. *McClelland*, 679 F.3d at 762. Although the Court must "apply its discretion consistent with the purposes of ERISA, those purposes being to protect employee rights and to secure effective access to federal courts, . . . there is no presumption in favor of attorney fees in an ERISA action." *Starr v. Metro Sys., Inc.*, 461 F.3d 1036, 1040–41 (8th Cir. 2006) (quotation omitted) (citing *Martin*, 299 F.3d at 972). That said, "a prevailing plaintiff rarely fails to receive fees." *Id.*

Provident has not challenged Dr. Chapman's request for fees. Coupling Provident's failure to object with ERISA's remedial principles and the five factors, the Court finds that Dr. Chapman is entitled to an award of reasonable attorney's fees.

First, although there is no evidence in the record of bad faith, Provident's position before the Court contradicts its position in the administrative proceeding and it also appears to have taken a position that no repetitive stress injury can be an "injury" under the Policy, a reading inconsistent with the Policy's language. *See supra* Conclusions of Law Section I.A.1. Second, Provident does not argue that it cannot pay Dr. Chapman's attorney's fees. Third, Dr. Chapman has raised a significant question in ERISA litigation: whether repetitive stress injuries are "injuries" under ERISA plans. Fourth, the balance of the merits heavily favors Dr. Chapman. The record lacks support for Provident's conclusion that a sickness caused Dr. Chapman's disability and its interpretation of the Policy language goes against reason and caselaw. *E.g.*, *Hallum*, 576 S.E.2d at 850. Finally, an award of attorney's fees may encourage Provident to more carefully consider the cases

23

of individuals who are disabled as the result of a repetitive stress injury. To determine the amount to which Dr. Chapman is entitled, the Court will entertain the submissions of the parties, including an affidavit from Dr. Chapman's attorney outlining the reasonable fees and costs incurred in this matter. Provident may submit a short letter brief in response.

## CONCLUSION

Based on the foregoing and on all the files, records, and proceedings herein, IT IS HEREBY ORDERED THAT:

1.  Defendant's motion for judgment (ECF No. 17) is DENIED;

2.  Plaintiff's motion for judgment (ECF No. 24) is GRANTED;

3.  Plaintiff's request for an award of costs, disbursements, and other expenses of this litigation, including reasonable attorneys' fees pursuant to 29 U.S.C. § 1132(g) is GRANTED;

4.  Plaintiff shall submit, within 30 days of the date of this Order, a declaration documenting her total benefit award, along with prejudgment interest on that award, and her reasonable attorneys' fees and costs; and

5.  Defendant may submit a response of no more than ten pages within ten days of Plaintiff's declaration.

LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated: August 18, 2021                           BY THE COURT:

                                                 s/Nancy E. Brasel
                                                 Nancy E. Brasel
                                                 United States District Judge